JOHN O. PAINE, PLAINTIFF, v. JERSEY CENTRAL POWER AND LIGHT COMPANY, BODY CORPORATE, DEFENDANT.

Decided June 10, 1934.

For the rule, *Henry D. Brinley.*

Opposed, *Henry Silverstein.*

LAWRENCE, C. C. J.  Defendant's rule to show cause is rested on the ground that the verdict of the jury at the trial in favor of plaintiff was contrary to the weight of the evidence. During the years 1929 to 1932, inclusive, defendant provided plaintiff at a place of business conducted by him with electric current for lighting.  The business appears to have been a seasonal one, and at the close of the period in 1931, plaintiff was indebted to the company in the sum of $155.  Desiring to reopen in 1932, he applied at the district office of the company, but was told by the manager that the current would not be turned on, unless the delinquent bill was paid.  He thereupon offered as collateral security certain shares of stock to which reference is made in the following receipt:

"April 30, 1932.

Received from Mr. J. O. Paine one Simmons Company common stock certificate No. A35994 for one hundred (100) shares issued to William Hipke.  This certificate was given Jersey Central Power & Light Company as collateral for bills

rendered for electrical energy consumed. This certificate to be returned to Mr. Paine when the above accounts are paid.

Very truly yours,

JERSEY CENTRAL POWER AND LIGHT COMPANY,

(Signed) L. MERRITT,

L. Merritt: H. O. C.                       Chief Clerk."

Upon the receipt of the stock, the company turned on the current and continued to serve plaintiff until on or about July 20th, 1932, when it appeared that plaintiff had paid neither the delinquent bill of 1931 nor the bills rendered to the date mentioned. Demand was thereupon made for payment and plaintiff authorized the sale of the stock held as collateral, writing a letter addressed to a brokerage concern directing them to make the sale and remit the proceeds to the company, inasmuch as it was held as security and he desired to liquidate his indebtedness to it. Since, however, the stock had not been issued directly to plaintiff and no satisfactory endorsement or authentication of the signature of the assignor appeared, the brokers declined to handle the transaction, and the company's local manager took the certificate to a bank where its accounts for the district were carried and requested it to communicate with the assignor and obtain a proper assignment enabling the company to make sale of the stock. The effort to do this was not successful, and the certificate remained with the bank until May, 1933, when the company gave its bond to secure the former against loss and the stock was sold. From the proceeds, after deducting broker's commission and plaintiff's indebtedness, which amounted to $976.38, an excess of $3.12 remained, which later, by letter under date of August 7th, 1933, the company sent to plaintiff.

He declined to accept it, on the ground that he did not owe the company the amount deducted from the proceeds of sale; that he had revoked the authority to sell in August, 1932, when he had discovered that he was being billed for electric current at a rate higher than that of 1931, and that the company, through an official, with whom he had taken the matter up in September, 1932, had recognized such revocation of sale. Thereafter, he insisted, the stock could not have been

sold without notice to him and none had been given. His suit was therefore to recover damages for the improper sale of the stock on the theory of conversion. The proofs disclosed that when the stock was left with the company as collateral in April, 1932, it was selling on the stock exchange for approximately $3 a share; when sold in May, 1933, it was then selling for $10, and on August 9th, 1933, twenty-four hours after plaintiff received the company's letter informing him of the previous sale it was quoted at $25. Plaintiff therefore claimed that he was entitled to the market price of the stock as of the latter date. At the trial, the jury so found, and returned a verdict in his favor for $2,500, less the amount of the company's bills which aggregated as stated $976.38, thus indicating the further finding that the bills as rendered plaintiff were correct.

On the argument of the rule, counsel for defendant company urged that there was no evidence offered at the trial from which the jury could have found that the written authority given by plaintiff to the company on July 20th, 1932, to make sale of the stock to liquidate the then indebtedness had been revoked and therefore the sale made in May, 1933, not only to cover such indebtedness but that later incurred, was not in violation of plaintiff's so-called right to notice of such sale.

There was evidence, however, that in August, 1932, plaintiff had protested the amount of the bills rendered, insisting that they were at a higher rate than in the previous year, and he testified that he had informed the local manager of the company that the stock should not be sold until an adjustment had been made. While this was denied, it did appear that in September, 1932, he had taken the matter up with the division manager, who, on the sixth day of that month, had written him a letter (offered in evidence) from which the following excerpts are taken:

"Since our last conference, I have submitted a written report and have discussed with Mr. Polhemus, our vice-president, the matter of your account with us. The proposition which you made is not satisfactory. Your proposition as I wrote it down was as follows:

"You will pay cash for all bills up to August 23d, 1932, readings at the old rate basis and from that date at the new rate basis, the latter under protest, until the case is settled by agreement, arbitration or court. Payment of the bills to August 23d reading are to be considered final and not a subject of further discussion.

\*　　　\*　　　\*　　　\*　　　.\*　　　\*　　　\*

"The above amounts include the federal tax on electricity from June 21st to August 23d in the amount of $10.02. This amount is all overdue (stated to be $762.86) and we must ask that it be paid on or before September 17th or it will be necessary for us to discontinue service. This ten days' time is allowed in view of the large amount of the bill and of your expressed wish to discuss the situation with Mr. Polhemus in case we are not willing to accept your proposition.

"As you have available according to your statements ready cash, we suggest that this payment be made in cash, in full, and we will return to you the stock certificate for 100 shares of Simmons Bed Company which you gave us as security but without satisfactory endorsement."

It appeared that plaintiff declined to accept the proposal and refused to pay the suggested sum. Notwithstanding the service was continued and additional bills for current were incurred and not paid, so that at the time of the sale of the stock posted as collateral, in May, 1933, admittedly without notice to plaintiff, the indebtedness had been increased, but remained disputed as to the amount. No further conferences or correspondence occurred or passed between the parties, until plaintiff was notified by letter under date of August 7th, 1933, of the sale of the stock on May 3d, 1933.

In the circumstances, it was open to the jury to find, as it apparently did, that there had been a revocation of the right to sell the stock in question, without notice, under the authorization of July 20th, 1932, and that the sale in May, 1933, without demand for payment of the then existing indebtedness and notice of the sale was improper and amounted to a conversion entitling plaintiff to damages under the rule of law stated in the court's charge.

As a general rule the pledgee is not entitled to sell the collateral upon default in the payment of the principal debt by the pledgor until demand for payment has been made and reasonable notice and opportunity to redeem the pledge has been given. 49 *C. J.* 997, § 248. Even though demand may have been waived or become unnecessary because of the attitude of the pledgor, it seems that notice of the sale is still required. See, also, section 250, and *Dimock* v. *United States National Bank,* 55 *N. J. L.* 296; 25 *Atl. Rep.* 926.

A careful review of the record in this case, leads to the conclusion that the rule to show cause must be discharged.